**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

---

ASHLEY BROOKE NEESE,

                Plaintiff,

v.

WILLIAM P. BARR,
in his official capacity as
ATTORNEY GENERAL OF THE UNITED
STATES,
U. S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

U. S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

COREY F. ELLIS
in his official capacity as
ACTING DIRECTOR OF EOUSA
Executive Office for United States Attorneys
950 Pennsylvania Avenue, NW
Washington, DC 20530

EXECUTIVE OFFICE FOR UNITED
STATES ATTORNEYS
950 Pennsylvania Avenue, NW
Washington, DC 20530

THOMAS T. CULLEN
in his official capacity as
U. S. ATTORNEY FOR THE WESTERN
DISTRICT OF VIRGINIA
310 1st Street, S.W., Room 906
Roanoke, Virginia 24011

U. S. ATTORNEY'S OFFICE FOR THE
WESTERN DISTRICT OF VIRGINIA
310 1st Street, S.W., Room 906
Roanoke, Virginia 24011

                **Defendants.**

Civil Action No.: 7:20CV260

## COMPLAINT

Plaintiff Ashley Neese ("Plaintiff" or "Ms. Neese"), by and through undersigned counsel, brings this cause of action against Defendants, William P. Barr, acting in an official capacity as Attorney General of the United States; the United States Department of Justice ("DOJ"); Corey F. Ellis, acting in an official capacity as Acting Director of the Executive Office for United States Attorneys; the Executive Office for United States Attorneys ("EOUSA"); Thomas T. Cullen ("Mr. Cullen"), acting in an official capacity as the United States Attorney for the Western District of Virginia; and the United States Attorney's Office for the Western District of Virginia ("USAO-WDVA").   In support thereof, upon personal knowledge as well as information and belief, Plaintiff alleges the following:

## JURISDICTION AND VENUE

1.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff's causes of action arise under the Constitution and laws of the United States.  The Court also has jurisdiction pursuant to 28 U.S.C. § 1361 because Plaintiff seeks a writ of *mandamus* to compel officers and employees of the United States and its agencies to perform duties owed to Plaintiff and required under the law.

2.   The Court has authority to grant declaratory, injunctive, and equitable relief, including reinstatement of Plaintiff to her employment with DOJ/USAO-WDVA, pursuant to the Declaratory Judgment Act.  *See* 28 U.S.C. § 2201, *et seq*, and its inherent equitable powers.

3.   Upon a finding that Plaintiff was unlawfully discharged in violation of her Constitutionally imposed and statutorily imposed rights, this Court would also have authority to award her appropriate back pay under the Back Pay Act, pursuant to 5 U.S.C. § 5596(b)(1), and to award her attorneys' fees and costs pursuant to 28 U.S.C. § 2412.

4.  Sovereign immunity for non-monetary relief is waived by 5 U.S.C. § 702, and by the fact that Defendants acted unconstitutionally and beyond statutory authority.

5.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e).

## PARTIES

6.  Ms. Neese is a citizen of the United States, who resides in the Commonwealth of Virginia.  Ms. Neese was employed as an Assistant United States Attorney ("AUSA") from on or about October 12, 2008, until the date of her unlawful termination, *via* constructive discharge, on or about June 29, 2018.  Throughout her tenure, Ms. Neese served the citizens of the Western District of Virginia as an AUSA in the USAO-WDVA's criminal division from on or about October 12, 2008, until on or about May 3, 2018.  Following unlawful employment actions, Ms. Neese was reassigned as an AUSA in the Civil Division beginning May 21, 2018.

7.  Defendant DOJ is a department of the Executive Branch of the United States of America pursuant to 5 U.S.C. § 101, and a federal agency within the meaning of 5 U.S.C. §§ 551(1), 552(f)(1), and 552a(a)(1), and 28 U.S.C. § 2671.  DOJ has offices throughout the United States and its headquarters is located at 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530.

8.  Defendant William P. Barr, serving as Attorney General of the United States and the head of DOJ, has his office in the District of Columbia.  He is sued only in an official capacity.

9.  DOJ oversees the components of this agency which includes Defendant EOUSA.  EOUSA provides executive and administrative support to the United States Attorneys and their respective offices.

10. Defendant Corey F. Ellis, serving as the Acting Director of EOUSA, has his office in the District of Columbia.  He is sued only in an official capacity.

11. The USAO-WDVA is one of the United States Attorney's Office's which receives executive and administrative support from EOUSA, and it is a part of DOJ. The USAO-WDVA has offices throughout the Western District of Virginia, including an office in Roanoke, Virginia.

12. Defendant Thomas T. Cullen, serving as the United States Attorney for the Western District of Virginia, has his office in Roanoke, Virginia. He is sued only in an official capacity.

## FACTUAL BACKGROUND

13. On or about October 12, 2008, Ms. Neese began working as a criminal AUSA for the USAO-WDVA in the Roanoke Office ("USAO-WDVA office" or "office"). Ms. Neese served the USAO-WDVA, DOJ, and the citizens of the Western District, with honor and integrity for more than nine years. During her employment as a criminal AUSA, Ms. Neese routinely (almost always) received "outstanding" overall evaluations on a yearly basis. Moreover, Ms. Neese maintained and prosecuted a heavy caseload year in and year out, and was a go-to prosecutor in the USAO-WDVA.

14. On or about May 3, 2018, around 11:45AM, attorneys Paul G. Beers (herein "Paul Beers" or "Beers") and Emma M. Kozlowski (herein "Emma Kozlowski" or "Kozlowski") arrived at the USAO-WDVA office located in the BB&T building in Roanoke, Virginia, to engage in a meeting with United States Attorney, Thomas Cullen (herein "Mr. Cullen," "USA Cullen," or "USA"), and other members of USAO-WDVA management.

15. Upon information and belief, within less than an hour, Mr. Cullen summoned Civil Chief, Laura Day Rottenborn ("Laura Rottenborn," "Civil Chief Rottenborn," or "Ms. Rottenborn"), who had been away having lunch with USAO-WDVA employee, Susan Bentley, back to the office. Ms. Rottenborn immediately returned to the office to meet with Mr. Cullen and other members of management.

16. In or around the same timeframe, management sent an email to the AUSAs in Ms. Neese's office canceling all previously scheduled training that afternoon.  This caused the staff to inquire as to what had caused the cancellation.  Around the same time, Deputy Criminal Chief, Heather Carlton ("Deputy Criminal Chief Carlton" or "Ms. Carlton"), Ms. Neese's then-supervisor, sent an email asking Ms. Neese if she would be around during the afternoon.  Upon information and belief, both emails were sent less than an hour after Mr. Beers and Ms. Kozlowski started their meeting with Mr. Cullen and other members of management.

17. Upon information and belief, the two emails were sent right after Mr. Beers and Ms. Kozlowski met with Mr. Cullen and other members of management.

18. In or around early afternoon, Deputy Criminal Chief Carlton came to Ms. Neese's office to escort her to the Main Conference Room on the ninth floor of the USAO-WDVA Roanoke Office for a meeting.  Ms. Carlton, however, remained outside of the Main Conference Room.

19. In the meeting, around 3:30PM, Mr. Cullen, Mr. Austin and Ms. Rottenborn were present.  Mr. Cullen informed Ms. Neese of vague allegations made about her by Mr. Beers and Ms. Kozlowski.  Specifically, Mr. Beers and Ms. Kozlowsi had accused Ms. Neese of having a sexual relationship with an individual with whom Ms. Neese was acquainted.  Neither Mr. Cullen, nor Ms. Rottenborn, asked Ms. Neese whether the allegations were true.  Nevertheless, Ms. Neese categorically denied Mr. Beers' and Ms. Kozlowski's allegations of a sexual relationship.  Mr. Cullen then told Ms. Neese that he was placing her on indefinite leave.

20. Mr. Cullen took Ms. Neese's Personal Identity Verification ("PIV") card, her work issued cellular telephone and her government-issued fob that allowed her access to certain floors in the BB&T building occupied and operated by the USAO-WDVA.  Mr. Cullen, Mr. Austin, and Ms.

Rottenborn made Ms. Neese sign a form confirming that she would contact EAP services within forty-eight (48) hours.

21. Upon information and belief, Mr. Cullen, when deciding to place Ms. Neese on indefinite leave, did not assess whether Ms. Neese's continued presence at the office (1) posed a threat to herself or her colleagues, (2) would result in a destruction of evidence relevant to an investigation, (3) would result in a loss or damage to government property, or (4) would otherwise jeopardize legitimate government interests as required by statute. Indeed, Mr. Cullen made the decision in a hasty and rushed fashion, and upon information and belief, without conducting the statutorily required assessment to determine whether the allegation could even be true.

22. Upon information and belief, Mr. Cullen failed to consider other options in the alternative to placing Ms. Neese on indefinite leave. Specifically, Mr. Cullen could have assigned Ms. Neese other duties, allowed her to take leave on her own terms, or allowed her to telework. Mr. Cullen did not consider or provide Ms. Neese with any of the aforementioned options.

23. Shocked, Ms. Neese requested access to the materials on which Mr. Cullen, Ms. Rottenborn, and Mr. Austin relied upon to place her on indefinite leave so that she could understand the actual allegations made against her, as she was not provided with any written notice outlining the allegations. However, the USAO-WDVA management declined her request.

24. Upon information and belief, Mr. Cullen made no independent assessment of Mr. Beers and/or Ms. Kozlowski's statements. Indeed, he solely relied on their representations when he decided to place Ms. Neese on indefinite leave.

25. At no point in time did Mr. Cullen provide Ms. Neese with any written notice explaining his decision to place her on indefinite leave, what type of leave it was considered, whether the

leave was paid leave or unpaid leave, and the duration of the leave, in compliance with either 5 U.S.C. § 7503 or 7513, or in compliance with 5 U.S.C. § 6329a and/or 6329b.[1]  Indeed, Mr. Cullen placed Ms. Neese on indefinite leave without providing her any written notice outlining the reasons why he placed her on indefinite leave and without affording her any other Constitutionally, statutorily, and/or administratively guaranteed procedural and substantive due process rights.

26. After the meeting ended, Ms. Rottenborn and Ms. Carlton escorted Ms. Neese, like a common criminal, from the Main Conference Room on the ninth floor to her office on the tenth floor in front of numerous employees.  Ms. Rottenborn and Ms. Carlton only allowed Ms. Neese to obtain her purse from her office even though Ms. Neese had numerous other personal belongings that remained in her office.  Shortly thereafter, Ms. Carlton and Ms. Rottenborn escorted Ms. Neese, again in front of numerous employees, out of her office.  Ms. Rottenborn and Ms. Carlton then escorted Ms. Neese back to the ninth floor to the Main Conference Room and then out of the office in front of numerous employees.  Ms. Rottenborn and Ms. Carlton's actions, which, upon information and belief, were at the direction of Mr. Cullen, caused Ms. Neese to feel extremely humiliated and as if she was under criminal investigation for allegations that were not true.

27. Following Ms. Neese's humiliating departure, the USAO-WDVA management team locked Ms. Neese's office on the tenth floor.  Moreover, upon information and belief, Ms. Neese's shared folder on the office's "G-Drive" was locked so that no other employees, besides management and IT employees, could access materials on the shared drive.

---

[1] In fact, throughout the remainder of her course of employment with the USAO-WDVA, Ms. Neese did not receive any written notice from any employee of DOJ explaining the reasons why she was placed on leave (i.e. - whether it was investigative leave and/or notice leave) on May 3, 2018.

28. Due to management's abrupt and public removal of Ms. Neese, rumors began spreading throughout the USAO-WDVA and the public regarding Ms. Neese and her status with the USAO-WDVA.   Several employees and law enforcement officers attempted to contact Ms. Neese.[2]   Moreover, Ms. Neese heard rumors that she had been arrested and/or fired from the USAO-WDVA.[3]

29. As a result of the unlawful and improper actions taken by the USAO-WDVA management team, and the rumors that followed, which USAO-WDVA did nothing to curtail, Ms. Neese's professional reputation was irreparably harmed.   She suffered severe stress and anxiety which in turn, caused harm to herself and her family.

30. On or about May 4, 2018, Ms. Neese remained on indefinite leave and contacted EAP services as directed on May 3, 2018.

31. On or about May 6, 2018, Deputy Criminal Chief Carlton and Mr. Austin contacted Ms. Neese and left a voicemail.   Deputy Criminal Chief Carlton also sent a follow-up email to Ms. Neese wherein she copied Mr. Austin.   The email stated:

> "Ashley:  I hope you are well.  As I just left in a voicemail on your personal cellphone, we have decided to extend your administrative leave for an additional ten business days, which will extend your leave out of the office through Friday, May 18, 2018.  We will contact you before Monday, May 21, 2018, to provide you with further instructions.  Do not return to the office during this period of

---

[2] Management at USAO-WDVA directed some employees not to contact Ms. Neese even though they had personal friendships with her.  Moreover, upon information and belief, the employees of the Federal Bureau of Investigation in Roanoke were informed by then-SSRA Jeff Taylor not to contact Ms. Neese.

[3] The USAO-WDVA appears not to have attempted to stop the circulation of rumors regarding Ms. Neese.  Early the following week, on or about May 8, 2018, the USAO-WDVA management only met with the USAO-WDVA Roanoke Criminal Division.  Upon information and belief, the Roanoke Criminal Division employees were informed Neese was placed on leave for an indefinite period of time and that she would not return to the office for the foreseeable future. Moreover, the employees were directed not to discuss any criminal matters with Neese.  Further, when given the opportunity to publicly address the matter, the USAO-WDVA failed to inform the public Ms. Neese remained employed by the USAO-WDVA. See footnote 8 herein.

time. Please respond by email to confirm receipt and acknowledgment of this message. Thank you."

No further information was provided to Ms. Neese regarding why she had been placed on leave as of May 3, 2018. Further, USAO-WDVA management again failed to inform Neese of the reasons why she had been placed on indefinite leave and as to whether she was placed on leave with or without pay.

32. On or about May 6, 2018, Ms. Neese's attorney, Mr. Barger, responded to Mr. Carlton's email in which he requested any and all materials relied upon by Mr. Cullen to place Ms. Neese on indefinite leave.

33. On or about May 7, 2018, Ms. Neese remained on leave and management still failed to inform her whether she was on paid or unpaid leave.

34. On or about May 8, 2018, Ms. Neese remained on leave. Based upon information and belief, the USAO-WDVA Roanoke Criminal Division met to address speculation regarding Ms. Neese's status. Based upon information and belief, during the meeting, management advised the Roanoke criminal division employees that Ms. Neese had been placed on leave indefinitely and management did not know when or if Ms. Neese would return to the USAO-WDVA Roanoke Office.

35. Later that same day, during a telephone conversation with Mr. Barger, Mr. Cullen informed him that Mr. Beers and Ms. Kozlowski's allegations were that Ms. Neese had a sexual relationship with a subject or target of a grand jury investigation. Mr. Barger informed Mr. Cullen that he believed the allegations were false.[4] Shortly thereafter, Mr. Barger confirmed to Mr. Cullen that the allegations were indeed false. Ms. Neese did not engage in a sexual

---

[4] Significantly, following the conversation between Mr. Barger and Mr. Cullen, on the very next day, May 9, 2018, USAO-WDVA management informed Mr. Barger that Ms. Neese should return to work as an AUSA in the Civil Division on May 21, 2018, more than ten (10) business days after Ms. Neese had been placed on leave.

relationship with anyone involved in any case she ever worked on while she was employed at the USAO-WDVA.[5]  If Mr. Cullen and other management had taken the time to perform even a scintilla of investigation into Mr. Beers and Ms. Kozlowski's allegations, they would have immediately seen that the allegations were baseless. [6]

36. Later, following the call between Mr. Barger and Mr. Cullen, Mr. Barger, via email, wrote Mr. Cullen:

> "Thomas, pursuant to our brief conversation today, this is to confirm my request for a copy of whatever Mr. Beers has submitted regarding Ashley Neese.  As I mentioned, I have asked OPR for a copy, but they were not yet comfortable providing one, and I advised that I plan to ask the USAO.  He [William 'Bill' Birney] indicated that he did not object to me asking and that your office had to make its own assessment of whether they would provide the information.  To state the obvious, there is no way for Ashley to defend herself without knowing the allegations and their basis, and without knowing whether Mr. Beers failed to provide all relevant information.  The selective mention of Ashley's name in an unrelated public filing to which she cannot object is shameful and reflects an agenda and a bias that cannot be overlooked.  I respectfully urge the office to allow me access to the material.  If we need to agree on some sort of protective order I am of course willing to do so."  Shortly thereafter, in response, Mr. Cullen stated: "David:  Thanks for the email.  We are considering your request – with input from EOUSA – and hopefully will be able to respond tomorrow.  Have a good evening.  Thomas" [7]

---

[5] Upon information and belief, numerous other employees, both presently employed and formerly employed, in the USAO-WDVA cannot assert the same.

[6] Although it has been nearly two years since USAO-WDVA management placed Ms. Neese on indefinite leave following the meritless allegations made by Mr. Beers and Ms. Kozlowski, Ms. Neese still does not know the ***exact*** allegations made about her.   This information and the records pertaining to Neese's indefinite leave, along with other materials, is the subject of Ms. Neese's FOIA and Privacy Act lawsuit pending in the District Court in the District of Columbia, as numerous DOJ components failed to timely produce FOIA and Privacy Act materials to Ms. Neese upon her request in July 2018, which forced her to file a lawsuit seeking compliance.  Moreover, upon information and belief, DOJ components have coordinated efforts to willfully and intentionally withhold responsive records and information from Ms. Neese for almost two years.

[7] To date, even though the information provided by Mr. Beers to DOJ components is about Ms. Neese, she has yet to receive a copy of at least some of the information provided by Mr. Beers and/or Ms. Kozlowski.  Ms. Neese was forced to file a civil lawsuit against DOJ, and its components, because DOJ components have willfully and intentionally withheld information and records from Ms. Neese, with which she is entitled, in a coordinated effort in an attempt to avoid production.   DOJ components' efforts attempting to avoid production to Ms. Neese are

37. Upon information and belief, the USAO-WDVA, EOUSA/General Counsel's Office, the Federal Bureau of Investigation ("FBI"), and the Office of Professional Responsibility ("OPR"), all initially treated the allegations made by Mr. Beers and Ms. Kozlowski, on May 3, 2018, as a potential criminal matter, wherein Ms. Neese had purportedly committed criminal conduct, to be analyzed by the FBI.[8] However, following the conversation Mr. Barger had with Mr. Cullen, the course of the way DOJ components handled the allegations immediately changed.  On May 11, 2018, OPR informed Mr. Barger, via email, that it had initiated an inquiry.  Given DOJ policy and guiding case law, if the FBI was conducting a criminal investigation into Ms. Neese as of May 11, 2018, OPR should not and would not have initiated an administrative inquiry.  Thus, upon information and belief, the initial direction taken by DOJ components was to first allow the FBI to analyze whether it would open a criminal investigation into the allegations made by Beers and Kozlowski on May 3, 2018, regarding Neese; however, once the DOJ components finally decided to independently analyze the purported allegations, which upon information and belief was after Mr. Barger's call with Mr. Cullen and being five (5) days after Neese was placed on indefinite leave, the matter swiftly became administrative in nature rather than criminal in nature.

38. On or about May 9, 2018, then-First Assistant United States Attorney Mountcastle informed Mr. Barger that Ms. Neese should report back to the USAO-WDVA on May 21, 2018, as an AUSA in the Civil Division.  Mr. Mountcastle did not provide a reason for the USAO-

---

astonishing and cause reasonable minds to wonder why DOJ components do not want the information and records, which pertain to her, released to Ms. Neese.

[8] In an unrelated public filing, on May 7, 2018, Mr. Beers included, in pertinent part, the following, "[d]efense counsel understands that United States Attorney Thomas Cullen shall disclose this disturbing evidence about AUSA Neese to the Court following further investigation by the Department of Justice's Office of Professional Responsibility and/or the FBI." *See United States v. Lance Hicks*, Western District of Virginia Case No.: 6:17CR00002-2, footnote 5.  The Roanoke Times published an article on this footnote in the unrelated filing on or about May 11, 2018.

WDVA's decision to allow Ms. Neese to return to the USAO-WDVA Roanoke Office, nor did

he provide an explanation as to why Neese had been placed on indefinite leave. Later that same

day, Mr. Mountcastle wrote Mr. Barger an email that stated:

> "Good evening David:  Sorry for the delay in responding to your email.  I can confirm that Ashley's administrative leave is with pay.  Also, I'd like to discuss with you next week how we intend to proceed beginning May 21.  Finally, we are still reviewing your request for a copy of the materials provided by Mr. Beers. I'll provide you with a response as soon as I'm able.  Thank you for your patience.  Rick."

For the first time since Ms. Neese was placed on indefinite leave without written notice on May

3, 2018, management informed Ms. Neese that her leave was with pay.  Although Mr. Barger

had been asking whether Ms. Neese's leave was paid since Ms. Neese had been placed on

indefinite leave, management had not decided nor responded to Mr. Barger until after Mr.

Barger's conversation with Mr. Cullen on May 8, 2018.

39. On or about May 10, 2018, Ms. Neese remained on leave.

40. Moreover, and of the utmost importance, the USAO-WDVA failed to inform the public

that Neese remained employed by DOJ/USAO-WDVA. [9]  Following the clear and unambiguous

lack of an attempt by the USAO-WDVA to try to protect Ms. Neese from more rumors being

spread about her, more rumors did begin to spread about Ms. Neese, including that she was no

longer employed by the USAO-WDVA, which was unquestionably false.  Ms. Neese was unable

to fully and effectively combat the rumors about her because the USAO-WDVA management

team never provided to Ms. Neese written notice explaining why she had been placed on

indefinite leave or any other due process.

---

[9] The USAO-WDVA could have contacted Neese's attorney and Ms. Neese to see if she wanted the public to know she remained employed by the USAO-WDVA.  However, the USAO-WDVA, on its own accord, chose not to contact Ms. Neese and chose not to inform the public of Neese's status as an employee of the USAO-WDVA, regardless of how it impacted Ms. Neese.

41. On or about May 14, 2018, upon information and belief, the USAO-WDVA purportedly was supposed to have employees search Ms. Neese's office on the tenth floor of the BB&T building.   Upon information and belief, the office remained locked with access purportedly limited to members of management.  This search, however, did not occur on this date.

42. On or about May 16, 2018, Ms. Neese sought medical attention from her Primary Care Physician (herein "PCP").  Ms. Neese experienced anxiety, depression and sleeplessness due to the way she had been treated by management.   Moreover, Ms. Neese was contending with the rumors that spread about her due to USAO-WDVA's lack of refuting those rumors.   Ms. Neese's PCP prescribed her anti-anxiety medication and provided her with a doctor's note.  Ms. Neese's PCP recommended that she take sick leave from work for four (4) weeks so that she could be evaluated and treated.

43. On or about May 17, 2018, Ms. Rottenborn sent an email to Neese that stated:

> "Hi Ashley, Are you available for a call today with Jason and me?  We would like to discuss the details of your return on Monday.  We are both available at 10:00 if that works for you?  Please let us know.  Thank you.  Laura"

44. On or about May 18, 2018, Ms. Neese responded to Ms. Rottenborn, via email.   Ms. Neese stated:

> "Laura and Jason: Based on the information I received from Mr. Barger, he asked me to reach out to you all.  It is my understanding that I should start back at the office on Monday, May 21, in the Civil Division.  At this time, I have a doctor's note that allows four weeks of sick leave.  I am currently working to come back to the office, but feel as if I need a few additional days to comply with my doctor's recommendation.   Thus, I would like to take sick leave next week, if that is acceptable, which would mean I intend to start back the day after Memorial Day.  Also, if you need a copy of the doctor's note, we can provide it to the office.  Please let me know if this is acceptable.  Further, when I do start back, who do I need to contact to obtain my piv card and access?  Thank you, Ashley."

45. Also, on or about May 18, 2018, the USAO-WDVA management team appointed Deputy Criminal Chief and then-Special Assistant United States Attorney, who was not a salaried

employee of the USAO-WDVA or a member of management, Rachel Swartz, to conduct a search of Ms. Neese's office.  For the USAO-WDVA to allow an unpaid employee who was not in management to be involved in reviewing potentially Privacy Act material shows the USAO-WDVA acted in reckless disregard for Ms. Neese's privacy.  Moreover, upon information and belief, the search occurred during office hours while numerous USAO-WDVA employees were present.  Again, upon information and belief, more rumors swirled during and following the search of Ms. Neese's office on May 18, 2018, which was also the date of Mr. Cullen's Installation Ceremony where numerous other USAO-WDVA employees from other offices in the district were in Roanoke.  Thus, based upon information and belief, the search was conducted during working hours not only during a day where numerous Roanoke employees were in the office but also on a day where numerous USAO-WDVA employees from around the district were in the office.  The USAO-WDVA continually and intentionally made efforts in an attempt to embarrass Ms. Neese, even though the USAO-WDVA knew as of May 8, 2018, and possibly before, that the allegations made by Mr. Beers and Ms. Kozlowski were completely baseless.

46. On or about May 19, 2018, in the A.M., Ms. Rottenborn sent an email to Ms. Neese. The email stated:

> "Hi Ashley – That plan works just fine.  And yes – when you return, I will be your supervisor in the Civil Division.  I am looking forward to seeing you.  On the 29th, please come to the 9th floor lobby at 9 am and ask for me.  Jason and I will get you set up then.  It is our standard practice to have a doctor's note for any sick leave more than 3 days, so if you could please email me your note or bring it with you on the 29th, that would be great.  I hope you're doing OK.  Laura."  In response, Ms. Neese replied "Laura, thank you for your response.  Enclosed is a picture of the note, and I will ensure that I get you and Jason a copy of it."  Ms. Rottenborn responded, "Thanks!!"

47. During the week of May 21-25, 2018, Mr. Barger attempted to communicate with members of the USAO-WDVA management team regarding a suggestion Mr. Barger had for

them.  Specifically, he suggested that the FBI interview the individual with whom Mr. Beers and Ms. Kozlowski had accused Ms. Neese of having had a sexual relationship to dispel the allegation.  Following Barger reaching out to USAO-WDVA management, via email at 1:41 p.m. on May 25, 2018, Barger received a response from then-FAUSA Mountcastle which stated:

> "Good afternoon David:   I apologize for having to cut off yesterday's conversation.  As you know, this topic has been discussed and reviewed by multiple offices, including EOUSA and other Department of Justice components. This matter is in its early stages and, to say the least, is in a state of uncertainty. As it stands now, the U.S. Attorney's Office is not in a decision-making position and, as such, we are not in a position to conduct, let alone make decisions about, particular investigative steps like the one you propose.  Should that change, we will contact you.  Have a great weekend.  Rick"

48. During the same week and after the communications in Paragraph No. 46, Mr. Barger and Mr. Mountcastle spoke via telephone.  Mr. Mountcastle informed Mr. Barger that the USAO-WDVA was conflicted out of the matter pertaining to the allegations against Ms. Neese, and that another USAO would contact Mr. Barger soon about the matter.  The information in Mr. Mountcastle's email of May 25, 2018, along with the information provided by Mr. Mountcastle during the telephone call to Mr. Barger, caused Ms. Neese more anxiety about how she had been treated regarding the allegations made by Mr. Beers and Mr. Kozlowski as Ms. Neese did not know the exact allegations made against her.[10]  Moreover, it caused major anxiety to Ms. Neese because OPR had already stated in writing, via email, that it had opened an administrative inquiry into the allegations.  Thus, for the USAO-WDVA to state that another USAO would contact Mr. Barger soon caused Ms. Neese to believe she was under criminal investigation.  The USAO-WDVA management team, along with other DOJ employees, knew the stress and anxiety it would cause Ms. Neese to inform her that the USAO-WDVA was conflicted out of the matter

---

[10] To date, Ms. Neese still does not know the specific allegations made about her, on May 3, 2018, by Mr. Beers or Ms. Kozlowski.  The request for records and information pertaining to Ms. Neese from May 3, 2018, and thereafter, is the subject of a FOIA and Privacy Act lawsuit brought by Ms. Neese in April 2019.

without providing any other information as to the allegations and/or the nature of why another USAO would supposedly be in contact with Mr. Barger. To date, significantly, no other USAO ever contacted Mr. Barger about the allegations made by Mr. Beers and Ms. Kozlowski; however, the USAO-WDVA management team made Ms. Neese and Mr. Barger believe that was to have happened.

49. On or about May 25, 2018, Ms. Rottenborn sent Ms. Neese an email stating:

> "Hi Ashley, Just confirming we are all set for Tuesday at 9 am? Please let me know. I look forward to seeing you then. Laura."

Ultimately, because of the way Ms. Neese was continually treated and due to information obtained from May 3, 2018, until May 25, 2018, Ms. Neese did not return to the office on May 29, 2018.

50. On or about May 31, 2018, Ms. Neese sent an e-mail to Ms. Rottenborn which stated:

> "Laura: I know you're out of the office next week and will not return until June 11, so if you are going to be in the office tomorrow, I can try to start back tomorrow, if that would work. If not, is there a plan in place for me to start back next week? Or, should I wait until you, as Civil Chief, return on June 11. Thank you, Ashley."

51. Shortly thereafter, Ms. Rottenborn responded:

> "Ashley, Tomorrow would be great. Let's do that. Would you please get here at 8:00 and come to the 9th floor to meet with Jason and me? Thanks and see you then! Laura[.]" Ms. Neese responded to Ms. Rottenborn by stating, "Thank you for your email. I will plan to be there at 8:00 a.m. to meet with you both. See you all then."

52. Ms. Neese returned to work on June 1, 2018, as an AUSA in the Civil Division.[11]

---

[11] Upon information and belief, numerous employees at the USAO-WDVA who had obtained an overall evaluation of outstanding received their raises and time-off awards during the month of May 2018. However, even though Ms. Neese had received an overall evaluation of "outstanding," management did not give Ms. Neese the raise she was supposed to receive in May 2018 when she returned to work.

53. Upon returning to the USAO-WDVA for the first time since being placed on indefinite administrative leave, Ms. Neese did not have access to the USAO-WDVA office space as she did not have her PIV card or a government-issued fob.  Thus, Ms. Neese could only access the publicly accessible space on the ninth floor.  When Ms. Neese returned to the reception-area, as instructed, which is open to the public, co-worker Isaac "Zac" Van Patten accompanied her. While waiting in the reception area, Ms. Rottenborn and Mr. Austin escorted Ms. Neese into the secure area of the USAO-WDVA office space and to the ninth floor Main Conference room for a meeting.

54. In the meeting, Ms. Neese felt extremely uncomfortable.  Management still had not provided her with any paperwork or written notice as to why management had placed her on leave.  Moreover, there was no explanation as to why she had been assigned to the Civil division or what her new job duties were as a Civil AUSA.   She was reminded how she had been treated and felt fear and intimidation. Mr. Austin and Ms. Rottenborn provided Ms. Neese with her PIV card and a fob to access portions of the USAO-WDVA secure office space.  However, Mr. Austin and Ms. Rottenborn informed Ms. Neese that she had restricted access to the USAO-WDVA office space.  The limited access was severely restricted.  Ms. Neese was only allowed to access the eighth floor with the PIV card and fob she was issued.  Ms. Rottenborn and Mr. Austin advised Ms. Neese that she could not access the tenth floor, where the criminal division was located and Ms. Neese's old office, where numerous personal belongings of Ms. Neese's had been located when she was escorted out of the USAO-WDVA office space on May 3, 2018. Moreover, Ms. Neese did not have access to the secured space on the ninth floor, even though the employees' mail was maintained in mailboxes in the secured space of the ninth floor.  Upon information and belief, Ms. Neese had less access than anyone else employed at the USAO-

WDVA at that time, including legal interns, except for the paralegal who had committed a criminal offense.  Mr. Austin advised Ms. Neese that in order for Ms. Neese to have access to the ninth-floor secured space, she would have to seek permission to enter the secured office space.

55. In the meeting, Mr. Austin and Ms. Rottenborn also informed Ms. Neese that she had no access to any criminal cases on which she had previously worked and that other AUSAs and criminal division employees were directed not to ask her questions about criminal cases.  Ms. Rottenborn directed Ms. Neese to inform her if any criminal division employee asked her about a criminal case.  Ms. Neese learned she did not have access to the shared G Drive or the shared S Drive on the USAO-WDVA's computer system.  Mr. Austin and Ms. Rottenborn advised Ms. Neese that she would have a new government issued email address, new work office telephone number instead of the direct dial number previously assigned to her, and a new laptop.  Ms. Rottenborn also offered Ms. Neese a new work cellular telephone with a new telephone number.  Ms. Neese's work cellular telephone had been seized on May 3, 2018.  Ms. Neese politely declined the offer and stated she did not see the need for a work cellular telephone since she was now an AUSA in the Civil Division and would not be a duty attorney.  Ms. Rottenborn and Mr. Austin advised Ms. Neese they would look into the matter to determine if she needed to be issued a work cellular telephone

56. In the meeting, Ms. Rottenborn also informed Ms. Neese that the USAO-WDVA management team was attempting to maintain her privacy with respect to the situation.[12]  Ms.

---

[12] Based upon information and belief, this statement was false.  For example, Ms. Rottenborn had left a copy of her notes taken during the meeting with Ms. Neese on May 3, 2018, visible to other employees who observed the notes.  Moreover, Ms. Rottenborn had also attempted to question one of Ms. Neese's personal friends in the office concerning the allegations made about her. Further, upon information and belief, Rottenborn also made other statements of interest about Ms. Neese to USAO-WDVA employees.  The USAO-WDVA management team also allowed a non-management unpaid SAUSA to engage in the search of Ms. Neese's office on the tenth floor.

Rottenborn informed Ms. Neese that when she was asked questions, she did not provide responses. Additionally, Ms. Rottenborn stated to Ms. Neese that the USAO-WDVA management team only knew a sliver of the information. Ms. Rottenborn did not expand upon that statement.

57. All of the restrictions imposed upon Ms. Neese by management caused Ms. Neese to suffer immense humiliation and fear.

58. Ms. Rottenborn escorted Ms. Neese to her new office space on the eighth floor. The office had previously been assigned to a paralegal for a number of years, and most recently, to an unpaid Special Assistant United States Attorney. The office did not have standard wood furniture that all other AUSAs maintained in their offices. Ms. Neese noticed that her personal belongings had not been moved to her new office on the eighth floor from her former office on the tenth floor.

59. Ms. Neese asked Ms. Rottenborn where her personal belongings were located and why her personal belongings had not been moved to her new office.

60. Ms. Rottenborn responded that she did not know where Ms. Neese's personal belongings were; however, Ms. Rottenborn stated that she suspected Ms. Neese's personal belongings remained in her former office. Ms. Neese responded to Ms. Rottenborn that she had been advised that her former office had been searched and cleaned out by Deputy Criminal Chief Heather Carlton and unpaid SAUSA, Ms. Swartz. Ms. Rottenborn stated that those individuals had only searched Ms. Neese's office for case-related materials. Ms. Neese then asked Ms. Rottenborn to please locate her personal belongings.

61. That same day, on or about June 1, 2018, Ms. Rottenborn provided Ms. Neese with two writing projects as assignments, tasks much different than Ms. Neese had previously been

assigned.  In fact, the tasks Ms. Rottenborn gave to Ms. Neese were the tasks typically given to legal interns, not an attorney with almost a decade of experience.  Ms. Neese was essentially treated in the same manner as a legal intern when she returned to the USAO-WDVA after being placed on leave.  Ms. Neese closed her office door in an attempt to have some privacy to allow her to process the information which Mr. Austin and Ms. Rottenborn had relayed to her.  She was extremely embarrassed and was concerned how it would appear to her co-workers and the impact on her professional reputation.

62. Later that day, and throughout the remainder of her employment in the USAO-WDVA, Ms. Neese observed that USAO-WDVA employees were intimidated and nervous to visit her or communicate with her.  In turn, Ms. Neese was intimidated and nervous due to Ms. Rottenborn's statement that if any criminal division employees attempted to discuss criminal cases with her, she would need to report their conduct to Ms. Rottenborn.

63. On or about June 4, 2018, Ms. Neese sent an email to Mr. Austin and Ms. Rottenborn as a follow up to the matters discussed on Friday, June 1, 2018.  It stated:

> "Jason and Laura: Good morning to you both.  My understanding from our meeting on Friday morning is that I currently have limited access to the USAO's space here in the BB&T building.  Currently, as I understand it, I am only allowed to enter the 8th floor space with my PIV card.  I do not have access to either the 9th or 10th floor spaces with my PIV card and fab.  Moreover, Jason advised me on Friday that if I need to come to the 9th floor, I would need to go to the reception desk to ask to be allowed into the space.  Also, as I understand it, I do not have access to my prior email account, my prior contacts, my prior information that was saved on my desktop and in my N Drive, and criminal matters in general, including items on the G Drive and the S Drive.  Based on learning this information on Friday when I came into the office and met with you both, I have a few questions, if you all can please answer them for me.
>
> 1.      Does any other employee, contractor, and/or legal intern have limited access to the USAO space in Roanoke and/or in other branch offices within the WDVA?  If someone does, will you please let me know?  If no one has limited access besides me, will you all please let me know?  Further, will you all please

let me know if others in the office space have been informed and/or know that I have limited access to USAO space?

2.      As a follow up, how will I get my mail from the mailroom on the 9th floor? Personally, I feel it will be somewhat embarrassing to me to have to go to the reception area to ask for access to the 9th floor to obtain my mail, etc.  Since I am now in the Civil Division, and as I understand it, I do not have one legal assistant that I am assigned to work with; rather, there are multiple legal assistants/paralegals, and each of those are assigned to work in a different aspect of the Civil Division.

3.      Regarding access to matters on my prior desktop and/or N Drive, I do know there are/were items saved that were attorney-client privileged information pertaining to my prior OPR/VSB investigation(s).  Am I able to have access to that information and if so, how can I obtain that information?  Has anyone else reviewed that information?

4.      Will I be able to access my prior calendar information that is linked to my prior account?

5.      Finally, I wanted to follow up on my questions from Friday – is there a key for my new office space?  If so, how can I get that key so that I can lock my door when I leave?  If not, please let me know.  And, will one of you please advise where my personal belongings are that were maintained in my prior office space?  Plus, when and how can I obtain those items?

Thank you all very much.  Ashley"

64. Mr. Austin responded to Neese's email wherein he stated:

"Hi Ashley – I can answer a couple of your questions now, and Laura or I will get back to you about the remaining ones as soon as we can. - Regarding a key to your office on the 8th floor, we have a key, and I will bring it to you sometime today. - Regarding access to the 9th floor for the purposes of gathering your mail, etc., we will modify your PIV card to add access to the 9th floor.  I will try to do this today and will let you know when it's done.  Someone will get back to you shortly with answers to your other questions. Jason[.]"  Neese responded at 11:25 a.m., stating, "Thank you, Jason.  I do appreciate it."

65. Later that day, due to how she had been treated, along with all the humiliating restrictions imposed upon her, including the fact that the USAO-WDVA did not even provide Ms. Neese with access to various research databases, or access to the internal intranet, of which other attorneys, paralegals, and even interns had access to, and which Ms. Neese needed to work on the two writing assignments, Ms. Neese became overwhelmed and felt extremely uncomfortable and unwell.  Ms. Neese emailed Ms. Rottenborn and stated:

"Laura: Good afternoon. I am writing to update you on my schedule, and to seek permission to take sick leave for the rest of the week, beginning at 2:00 p.m. today. Friday and today have been a bit overwhelming for me. My doctor's note is on my desk in my office, and I can leave it here for Jason. The note is dated May 16, 2018, and allows for up to four weeks of sick leave. Presently, I have attempted to access Westlaw, WestLegaled, and our Intranet page, in order to review civil information and to work on the projects that you have assigned to me; however, I am unable to access those pages at this time. Additionally, if you all are able to answer my other questions from Friday and this morning, please also copy my other email address. That will allow me to receive your responses/have access while I am out of the office. Finally, previously I had scheduled annual leave beginning June 15 and ending June 22, as we have a scheduled vacation out of town. If possible, I would like to use an additional day, June 14, for leave (time off or annual leave), for travel purposes. Please let me know if that is approved.
Thank you,
Ashley[.]"

66. On June 5, 2018, at 4:12 a.m., Civil Chief Rottenborn responded and stated:

"Ashley, Does that mean you will be back in the office June 11-13? And then again on June 25? Just confirming. Thanks. Laura"

67. Ms. Neese responded to Ms. Rottenborn and Mr. Austin and stated:

"Good morning. Yes, ma'am. That is my plan if that is acceptable and approved. I also plan to reach out to Debbie Wood when she returns to the office and after she has had time to settle in to see if she can help me get access to WestLaw. And, Michele was out on Friday and yesterday, while I was there, so I may reach out to her as well to see if she can provide assistance to me on the projects we discussed on Friday. Thank you."

68. Ms. Neese remained on sick leave from June 5, 2018, through June 8, 2018.

69. On or about June 10, 2018, Mr. Austin sent an email to Ms. Neese and Ms. Rottenborn, responding to the questions Ms. Neese posed on June 4, 2018. The email stated:

"Hi Ashley – We wanted to get back to you with some additional information about the remaining questions that you have. 1. We cannot discuss the specifics of any other employees, contractors or interns with you. I can let you know that only some members of management, who have a need to know, are aware that your access to the 10th floor has been limited. 2. Regarding your concerns with the mail room, we added 9th floor access back to your PIV card on Monday, June 4. 3. We certainly want to get your attorney-client privileged information back to you. To date, no one has accessed your N Drive. Do you

recall if this information is saved in a specific subfolder on your N Drive, or do you know the names of the files?  Once we're able to determine what material needs to be returned to you, Debbie Wood can move the files from your old N Drive to your new one.   4. We can export your old Outlook calendar and get that information to you.  Debbie Wood will work with you on this issue next week.  5.  Your personal belongings are still in your old office on the 10 Floor.  Zach Lee will be in the Roanoke office on Tuesday and can help you obtain them.  Items that are clearly personal – pictures, plaques, decorations, etc. you will be free to collect.  Criminal Case Files and anything containing law enforcement sensitive information or referencing DOJ matters will need to remain on the 10th floor.  If you need anything else, please let either Laura or myself know. Jason[.]"

70. Ms. Neese did not receive this email until on or about June 11, 2018, as she did not have a work cellular telephone with email access.

71. Mr. Austin's statement that only some members of management knew that Neese's access was limited is categorically false. Numerous USAO-WDVA employees knew that Ms. Neese could not access the tenth floor.  Moreover, the criminal division attorneys knew Ms. Neese's former office was locked and they had been directed to not discuss criminal matters with her.

72. On or about June 11, 2018, Ms. Neese returned to work at the USAO-WDVA Roanoke office.  During her medical leave, Ms. Neese had been anxiety-ridden, sleepless and depressed. Her professional reputation was irreparably harmed, some of her colleagues, and members of the public at large, believed that she had engaged in criminal actions and treated her like a pariah. Management had asked her to completely change her work and assume a position in the Civil Division when all she had ever predominantly practiced was criminal law.  She was essentially treated like a legal intern rather than a full-fledged AUSA.  There was no potential career growth for Ms. Neese in the Civil Division.  Indeed, it was a well-known fact in the office that if management transferred an attorney from the Criminal Division to the Civil Division, they had done so as a punishment to the attorney.  The Civil Division was less prestigious than the

Criminal Division and for all intents and purposes, it is where an attorney's professional reputation went to die. It was very clear to Ms. Neese that management had purposefully placed her there because they no longer wanted her at the USAO-WDVA and had placed her in the Civil Division with the intention of forcing her to resign. Thus, management's actions were effectively, a termination.

73. That same day, Ms. Neese met with Ms. Rottenborn. During the meeting, Ms. Neese informed Ms. Rottenborn that she intended to submit her notice of resignation. Ms. Neese informed Ms. Rottenborn that she had to protect herself and that she would protect herself.

74. Upon information and belief, shortly after Ms. Neese met with Ms. Rottenborn, Ms. Rottenborn met with Mr. Cullen, and other members of management, in Mr. Cullen's conference room on the tenth floor. Based upon information and belief, during the meeting, Ms. Rottenborn notified Mr. Cullen and others about Ms. Neese's notice of resignation.

75. Later on June 11, 2018, Ms. Neese emailed Ms. Rottenborn and Mr. Austin, and stated:

> "Laura and Jason: Enclosed please find a letter setting forth my intent to resign from the United States Attorney's Office effective June 29, 2018. Please let me know what you and the office will require from me during this transfer period. Additionally, I would like to use one of my time-off award days tomorrow for leave purposes. Further, I have spoken with Laura in person, and will continually update her about my leave throughout the next few weeks.
>
> Thank you,
> Ashley[.]"

76. Prior to the submission of Ms. Neese's notice of resignation, no member of management of the USAO-WDVA, and no DOJ employee, tried to correct the unlawful and improper actions the USAO-WDVA management team, along with input from EOUSA/General Counsel's Office, had taken against Ms. Neese beginning May 3, 2018, and continuing through the remainder of her employment with the USAO-WDVA. Moreover, following submission of her notice of

resignation, no member of management from the USAO-WDVA, and no employee of DOJ, reached out in an attempt to try to correct the unlawful and improper treatment of Ms. Neese. Ms. Neese never received any written notice, or any due process, outlining why she was placed on indefinite leave on May 3, 2018, or explaining why she was reassigned employment positions with extremely restricted access in the USAO-WDVA office space and within its computer system.

77. At no point in time following Ms. Neese's return to work on June 1, 2018, did Mr. Cullen, or any other member of management besides Ms. Rottenborn and Mr. Austin, attempt to make contact to discuss Ms. Neese's reassignment of position, restricted access, or any other matters with her.

78. On or about June 11, 2018, Ms. Neese emailed Ms. Rottenborn and Mr. Austin requesting the use of certain types of leave. Ms. Rottenborn responded:

"That's fine. Thanks[,]" Accordingly, Ms. Neese remained on leave from June 12, 2018, through June 22, 2018.

79. On or about June 20, 2018, while Ms. Neese was on leave, Ms. Rottenborn sent Ms. Neese an email which stated:

"I hope the beach is great. I am writing to confirm your plans for the week of June 25. Will you be in the office that day? Do you plan to take any leave that week? Is your resignation date still June 29? We need to go through some closeout procedures, so I will need you in the office at least part of one day before you fully depart. We need to give you an opportunity to get your personal belongings out of the office, as well as identifying any personal emails you want saved to a thumb drive to take home with you. I will be in trial June 25 and 26, but Jason and Debbie are available to assist those days. Will you please let me know? Thanks."

In response, Ms. Neese stated:

Hi Laura and Jason:

Thank you for your email. I anticipate taking some sick leave for scheduled appointments for Grant and me next week. But, I would like an updated account of all of my hours, since I do not have access to that information. Will one of you please provide me with my updated leave numbers

Also, I have numerous questions regarding my resignation and separation from service. Some of those questions pertain to benefits. Specifically, health care benefits, and when they will last until. Presumably, as I understand it from Zac, we will have 31 days of coverage following my last date of employment. Thus, even though June 30 is a Saturday, I was wondering if that could be my official last day so that we can be covered through July 31 (if my information is correct). My new benefits will start on August 1, 2018, and I want to ensure coverage through that date, if possible. My other questions pertain to life insurance, tsp, deferred annuity, etc. Who may I plan to meet with to obtain this information? *Finally, I would definitely like to obtain my personal belongings. Have those been located? Also, since I do not have access to the 10th floor without being escorted, I would ask that I not have to obtain my personal belongings during work hours, so that other people do not see that I have to be escorted*. I do know Zac offered to help me get my stuff, and Curtis would like to come as well, if that is allowed. I also need to obtain my attorney client privileged information, etc., and I will discuss that with my attorney.

I know that June 26 is likely to be a sick day if that request is granted. I'll contact you all again soon, and if you all can please let me know the answers to my questions, I would greatly appreciate it.

Thank you,
Ashley

(emphasis added).

80. On June 21, 2018, Mr. Austin responded to Ms. Neese, via email, and stated:

"Hi Ashley – I've attached a screenshot with your leave balances, as of PP12. You should be able to access this information from home, via Employee Personal Page (www.nfc.usda.gov) as well.  If that doesn't work, please let me know. When you are in the office next week, John Frasca or myself can go over the standard closeout benefits information with you.  Just come see either of us.  Your health insurance does continue for 31 days, though.  *If you are going to be in the office on Monday, June 25, Zach Lee and Rick are available at 4:30 to help you retrieve your personal belongings from your old office on the 10th floor*. Jason[.]"

81. Management was determined to humiliate Ms. Neese and thus, Mr. Austin refused to

provide Ms. Neese any time outside of working hours to retrieve her personal belongings so that

other employees would see her being escorted around the USAO-WDVA office space.  Although Ms. Neese clearly was not under any criminal investigation, the USAO-WDVA management continued to treat her as if she was, and continued to maintain that it had to escort her to the tenth floor office space, including remaining with Ms. Neese in her former office, even though the office had been searched on May 18, 2018.

82. On or about June 22, 2018, Ms. Neese sent Mr. Austin and Ms. Rottenborn an email where she requested to take leave during part of the following week.  Moreover, Ms. Neese asked whether she needed to communicate directly with IT regarding attorney-client privileged information that was located on her previous work computer.  Ms. Neese also asked a question regarding health insurance.

83. By June 24, 2018, management had not responded to Ms. Neese's email.  Thus, she sent a follow up e-mail to Ms. Rottenborn.  She responded that Ms. Neese's leave requests had been approved.  Ms. Rottenborn asked Ms. Neese to work on a time to come in later that week and she informed Mr. Austin to adviseMs.  Neese with answers to her questions of June 22, 2018, when he was able.

84. On or about June 25, 2018, Mr. Austin emailed Ms. Neese and Ms. Rottenborn.  As part of his email, Mr. Austin stated:

> "[r]egarding cleaning out your office on the 10th floor and accessing any potential attorney-client privileged information on the network drive, please see either Laura or myself on Thursday morning."

Again, Mr. Austin refused Ms. Neese's request to retrieve her personal belongings at a time outside of working hours.

85. On or about June 26, 2018, Ms. Neese sent an email to Mr. Austin and Ms. Rottenborn. which stated in pertinent part:

"[r]egarding my personal belongings and files on the computer/server, my understanding is that my attorney spoke with Rick yesterday. I am hoping to have more guidance before I return to the office, and a plan in place. I think my attorney will also be submitting a further request to our office on Wednesday or Thursday, and he has spoken to Rick about that matter as well. But, for now, is the plan for me to get my personal belongings and review items in my office on Thursday or Friday? Further, do I have out-processing to complete and an exit interview? I don't recall anyone telling me that I have to do either of those; however, it is my understanding that other employees who have left federal service have had to complete those tasks prior to leaving. If I do need to complete those tasks, please let me know. Also, please let me know when those would take place. Finally, I had previously asked if I need to schedule a time to meet with Debbie Wood, or if one of you could check with her about a specific time, to obtain items from the server. Please let me know what I need to do, if anything. Also, do I need to bring my own flash drive to download the material to it?"

86. Ultimately, the USAO-WDVA never offered Ms. Neese an exit interview. Moreover, although when almost every employee leaves the USAO-WDVA, the employee receives a DOJ seal that the district incurs the cost for and sends around for employees to sign. To date, Neese never received a DOJ seal like other employees who have left the USAO-WDVA.

87. Having not received a response to her e-mail, Ms. Neese sent a follow-up email to both Ms. Rottenborn and Mr. Austin. As part of the email, Ms. Neese stated:

"I wanted to follow up with you all to see if you all could provide me with some answers to questions I have been asking. Also, when do you think I will be able to get my personal belongings and go through other materials in my office on the 10th floor? And, do I have paperwork to complete?"

88. Finally, on or about June 27, 2018, Mr. Austin responded. In pertinent part he stated:

"Someone will be available to facilitate your access to your 10th floor office tomorrow morning. Please confirm that you are planning to come in then."

Ms. Neese confirmed that she would be in the office on June 27, 2018.

89. Moreover, on June 27, 2018, Neese's counsel, Mr. Barger, sent Mr. Mountcastle and email in an effort to have the USAO-WDVA preserve relevant materials.  In relevant part, the email stated:

> "Rick: As you know, I represent Ashley Neese.  Ashley has resigned her position as an AUSA, effective, June 29, 2018, and will pursue other opportunities. Certainly a factor in her decision to leave has been the latest actions by Paul Beers, and the DOJ's response/nonresponse to his actions, including, but not limited to, the failure to provide Ashley and me with any meaningful information and/or to engage in any meaningful discussion about the allegations, and whether I may have useful information regarding this matter . . . We have, of course, not had access to any information that DOJ has received and thus have not had any opportunity yet to respond.  It is unclear exactly how Ashley's leaving will impact our abilities in that regard.  Out of an abundance of caution, I write to request that the USAO and DOJ preserve all relevant information that may be useful to Ashley in responding, and in related matters.  This includes, but is not limited to, any and all information submitted by Mr. Beers, any emails or phone messages from Mr. Beers, any notes taken of conversations with Mr. Beers, any related text messages, any investigative materials gathered concerning the allegations by Mr. Beers, including, but not limited to, any notes of any interviews with witnesses or third parties.  In addition, please preserve Ashley's Outlook Calendar and documents, notes, and emails related to Operation Pain Train, . . .  Thank you for your courtesies in this matter.  If you have any questions, please let me know. Regards.  David."

Again, following the email of June 27, 2018, the USAO-WDVA failed to provide responsive materials to Ms. Neese.  To date, after almost two years of requesting materials, following formal FOIA and Privacy Act requests in June 2018, and a civil lawsuit file in April 2019, many of those records and materials have yet to be produced to Ms. Neese even though the materials pertain to  Ms. Neese, are materials she created and/or reviewed while she was in the USAO-WDVA, etc.[13]

90. From May 3, 2018 to June 27, 2018, and thereafter, Ms. Neese and her counsel continually requested materials pertaining to why she was placed on indefinite leave. Management continually denied this information from the USAO-WDVA/EOUSA and OPR.

---

[13] See, e.g., 28 CFR § 16.300.

Without the materials, Ms. Neese was never able to defend herself against the accusations. Moreover, Ms. Neese continually received disparate treatment from numerous employees of the USAO-WDVA, and other DOJ components, based on accusations that, even if true, which they were not, was not a violation of the law or of any specific DOJ policy.

91. On or about June 28, 2018, Ms. Neese returned to the USAO-WDVA Roanoke Office. While she was there, Ms. Neese met with Mr. Austin who escorted her to the tenth floor. Following a brief meeting, Mr. Austin escorted Ms. Neese to her former office and unlocked the office for she and Mr. Austin.  While Ms. Neese was with Mr. Austin in her former office, other employees, including then-AUSA Steve Pfleger, observed Ms. Neese in her former office going through materials to identify her personal belongings.  Ms. Neese and Mr. Austin packed up boxes of Ms. Neese's personal belongings during work hours while numerous other employees were working, and observed Ms. Neese being escorted to her former office and throughout the tenth floor office space.

92. On or about June 29, 2018, Ms. Neese ended her employment with the USAO-WDVA due to the improper, unlawful, and intentional employment actions taken against her by the USAO-WDVA, EOUSA, and potentially other DOJ components.  The continual mistreatment of Ms. Neese forced her to resign, as she had been subjected to unlawful, intentional, and improper actions that irreparably harmed her professional reputation, humiliated her, caused her anxiety, stress, and depression, and left her no other choice.

## **COUNT ONE**

**Defendant Placed Plaintiff on Indefinite Leave Without Following Proper Requirements of Statutory Procedures and Agency Policies, in Violation of the Fifth Amendment's Due Process Clause**

93. Paragraphs 1-92 are incorporated and reasserted as if fully set forth herein.

94. Pursuant to 5 U.S.C. § 6329(b) Defendant must consider (1) whether a continued presence of the employee may pose a threat to the employee or others, (2) result in the destruction of evidence relevant to an investigation, (3) result in loss of damage to government property, or (4) otherwise jeopardize legitimate government interest.

95. Defendant placed Plaintiff on indefinite leave without considering the four statutorily required factors in Paragraph No. 94.

96. Defendant failed to provide written notice to Ms. Neese in compliance with statutorily created obligations.  Defendant failed to provide Plaintiff with written notice explaining the type of leave on which she had been placed, the applicable limitations, including the duration of the leave, and explaining to Plaintiff that the agency shall take an action, as statutorily required.

97. Defendant failed to consider any alternative options to indefinite leave as statutorily required.

98. Defendant failed to seek higher authority and/or approval when placing Plaintiff on indefinite leave longer than ten (10) business days as statutorily required.

99. Defendant violated the Fifth Amendment by ignoring applicable statutory and agency processes in order to place Plaintiff on indefinite leave and depriving her of her property interest without due process of law in violation of the Fifth Amendment to the Constitution.

100. Neither the Civil Service Reform Act of 1978, nor any other statute or regulation, affords Plaintiff an administrative remedy or any other alternative scheme to obtain relief for the violation of her rights under the Constitution.

## **COUNT TWO**

**Defendant Terminated Plaintiff in Violation of the Fifth Amendment's Due Process Clause**

101. Paragraphs 1-100 are incorporated and reasserted as if fully set forth herein.

102. Defendants further violated the Fifth Amendment by ignoring applicable statutory and agency processes in order to facilitate Plaintiff's termination, thereby depriving her of her property interest in her employment and related benefits, including health insurance, without due process of law. Section 7543(b)(1) provides that an employee facing action for misconduct is "entitled to . . . at least 30 days' advance written notice" of a proposed removal action, "unless there is reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment can be imposed, stating specific reasons for the proposed action[.]"

103. Plaintiff was entitled to written notice of the allegations and an opportunity to respond to any and all allegations against her before Defendant took its adverse action against her forcing her resignation.

104. Plaintiff was never afforded any explanation why Defendant placed her on leave much less given an opportunity to defend herself against the false allegations.

105. Moreover, regardless of the nature of cause for termination, Plaintiff is entitled to "a reasonable time, but not less than seven days, to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer" to the proposed notice of termination. 5 U.S.C. § 7543(b)(2).

106. Defendant never afforded the Plaintiff any explanation as to why Defendant placed her on indefinite leave or why Defendant assigned her to work in the civil division, without affording Plaintiff with an opportunity to defend herself against the allegations. This adverse action, without providing to Plaintiff her due process rights, resulted in her forced resignation.

107. Defendants' unlawful action harmed Plaintiff by denying her due process, damaging her professional reputation, depriving her of her rightful status as a criminal AUSA in good standing with the agency, and eliminating her primary source of income and related benefits.

## COUNT THREE
### Mandamus

108. Paragraphs 1-107 are incorporated and reasserted as it fully set forth herein.

109. The provisions of 28 U.S.C. § 1361 provide a statutory basis for jurisdiction in cases seeking relief in the nature of mandamus against federal officers, employees, and agencies, and they provide for an independent cause of action in the absence of any other available remedies.

110. Defendants' actions, as set forth above, constitute an unlawful refusal to recognize Defendants' actions constituted unlawful personnel actions.

111. Plaintiff has a clear right to be reinstated as an Assistant United States Attorney in the USAO-WDVA's criminal division.

112. Defendants have a clear non-discretionary duty to rescind Plaintiff's unlawful termination.

113. If no other remedy is available through which Plaintiff can be properly reinstated, then Plaintiff is entitled to relief in the nature of mandamus compelling Defendants to rescind its decision to assign her to the civil division, in treating her unlawfully and improperly, and in treating her disparately.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

(a) declare that Plaintiff's termination illegal, or, in the alternative, that Defendants violated Plaintiff's Constitutional and statutorily created rights by placing her on indefinite leave and terminating her employment;

(b) reinstate Plaintiff's employment as Assistant United States Attorney for the Western District of Virginia, in the Criminal Division, or in a comparable position without fear of retaliation, a position she would have occupied absent Defendant's violation of Plaintiff's

constitutional, statutory, and administrative rights, and declare her employment to be retroactive to the date of her termination with applicable back pay, pursuant to the Back Pay Act;

(c) if, for whatever reason, the Court declines to award plaintiff reinstatement, then award her appropriate front pay as a substitute of reinstatement;

(d) enjoin Defendants from further retaliation and other violations of Plaintiff's rights;

(f) issue writs of mandamus as appropriate;

(g) award Plaintiff her costs and reasonable attorneys' fees incurred in this action, and the claims that necessarily preceded it;

(h) award pre-judgment and post-judgment interest on all amounts awarded herein; and

(i) award other relief as the Court deems just.

### **JURY DEMAND**

Plaintiff requests trial by jury.


Dated:  May 2, 2020                                    Respectfully Submitted,


_____
Rosanna C. Lopez, Esquire Virginia
State Bar No. 70547
Lopez & Wu, PLLC
1818 Library Street, Suite 500
Reston, VA 20190
(703) 835-6145 (telephone)
(703) 831-0181 (facsimile)
Attorney for Ashley Brooke Neese